IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD 1687-06






CODY LEE OURSBOURN, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


HARRIS COUNTY





 Cochran, J., delivered the opinion of the unanimous Court.


O P I N I O N 



 We granted review in this case to clarify when a trial court has the duty to instruct the
jury on the voluntariness of a defendant's statement in the absence of any request for such
instructions. (1) We hold that when the evidence raises an issue of the "voluntariness" of a
defendant's statement under Article 38.22, (2) the trial judge must give a general voluntariness
instruction under Sections 6 and 7 of that article because it is the "law applicable to the case." 
But when the defendant does not request this statutorily mandated instruction, the trial
court's failure to include it is reviewed only for "egregious harm" under Almanza. (3) In this
case, a majority of the court of appeals held that, because appellant did not object to the jury
charge or request any instruction on voluntariness, there was no error in the charge. (4) We
conclude that the trial judge did err, and therefore we reverse and remand the case to the
court of appeals to determine if appellant suffered "egregious harm" under Almanza. 

I.
 

The Background Facts and Procedural History


A. The Facts

 Frances Rapp drove her Chevy Impala to a Houston nightclub off Richmond Avenue
one night in November, 2003. Her friend, Brendon Martin, was with her. As they got out
of the Impala, they were "car-jacked" by a light-skinned man wearing dark clothes and
gloves and a beanie on his head. That man approached them and pointed a semi-automatic
handgun against Ms. Rapp's stomach and demanded her car keys. She complied. The
gunman then drove off in her car, which was equipped with "OnStar," a communications and
tracking service. Ms. Rapp called both the police and "OnStar."

 At about 3:30 a.m. that night, "OnStar" located the Impala. HPD Sergeant De Los
Santos was dispatched to the location-an apartment complex. He waited until someone got
into the Impala and drove it off, then he initiated a traffic stop. But the driver, later identified
as appellant, did not pull over; instead he sped up, leading Sgt. De Los Santos and three other
patrol-car units on a short chase. Appellant drove southbound in a northbound lane, then
jumped out of the Impala and fled on foot. When appellant tried to cross a bayou, he slipped
on a rock and hit his head. The officers caught up with him and took him into custody.
Because appellant suffered a minor injury, he was taken to Ben Taub Hospital.

 The officers then contacted Ms. Rapp who came to the scene and gave them
permission to search her car. The Impala was undamaged, but her purse, CDs, DVDs, and
camera were missing. The "OnStar" manual was on the passenger seat, and its casing had
been removed from the unit in the trunk. Gloves like those worn by the car-jacker were on
the console.

 Two days later, HPD Investigator Colleen Guidry showed a photo lineup to Ms. Rapp,
Mr. Martin, and a third witness, Olivia Martinez. Although appellant's photograph was in
the lineup, all three picked out other people.

 Investigator Guidry then interviewed appellant. She read him his Miranda rights, and
he agreed to waive them and make a videotaped statement. Investigator Guidry denied
making any promises or threats or using coercion in taking the statement, and she said that
appellant never asked for a lawyer. She also said that he was injured and had a neck brace
on, which impaired his ability to communicate somewhat, but otherwise he had no physical
problem speaking. He did not appear intoxicated. 

 At first, appellant said that he had been at a different nightclub that evening. To get
him to "tell the truth," Investigator Guidry lied and said that "some of the witnesses had
picked him out of the photo spread," and they said that he had a gun. Appellant then
admitted to the car-jacking, but said that he did not have a gun. He explained that the
witnesses might have thought that he did because he is not able to flex his index finger and
he had dark gloves on. Appellant did not tell Investigator Guidry that he was bipolar.

 A week later, Ms. Rapp and Mr. Martin viewed a live lineup which included
appellant, but again they picked out other people. Investigator Guidry described all of these
identifications as "tentative" and thus "unreliable."

B. The Procedural History

1. Pretrial

 Appellant was indicted for aggravated robbery. The trial judge ordered a competency
evaluation, and appellant was interviewed on January 29, 2004, by a court-appointed
psychologist, Dr. Edward P. Friedman, who concluded that appellant was incompetent to
stand trial. Appellant was admitted to North Texas State Hospital for observation and
treatment. Later that year, he was declared competent and returned to Houston to stand trial. 
 Appellant then filed a motion to suppress his videotaped statement, alleging that "he
was not competent to understand his rights and knowingly and voluntarily waive his rights
to make the statement." He noted that the trial court had previously found him "incompetent
in this case." At the hearing on his motion to suppress, the State called three witnesses: Sgt.
De Los Santos testified to the facts of the arrest; Investigator Guidry testified about taking
appellant's statement; and Dr. Friedman testified about appellant's mental status.

 Dr. Friedman said that, based on his initial interview, appellant was not competent to
stand trial because he was depressed and non-verbal. Appellant was "so depressed that he
simply wasn't motivated to speak" and "might be too depressed to be motivated to cooperate
with defense counsel." Dr. Friedman said that he met with appellant three more times during
the following year and "felt that he was competent." He was communicative and "what he
communicated to me was accurate and indicated that he did have both . . . an adequate and
an accurate understanding of the criminal justice system." Dr. Friedman also stated that he
thought that appellant was competent when he gave his videotaped confession on November
24, 2003, even though "initially he was fairly uncommunicative with the police officer who
was interviewing him, just as he had been with me." (5) Dr. Friedman agreed that persons with
bipolar disorder might "have trouble evaluating their constitutional rights and making a
proper choice as to what to do with those in mind," but only if they were so depressed that
they did not care what happened to them. In this case, appellant appeared depressed at the
beginning of the tape, but he later appeared "very motivated to present himself in a more
favorable light," which indicated that "he wasn't that depressed." (6)

 Defense counsel argued that appellant's statement should be suppressed because,
"looking at the first part of his statement where the warnings were given, is when he
appeared to be uncommunicative and in a depressed state." The trial judge denied the motion
to suppress without making findings of fact and conclusions of law. (7) 

2. The Trial

 At trial, defense counsel argued in his opening statement that appellant had made a
"false confession" to protect his girlfriend's relatives. When the prosecutor offered the
statement into evidence, defense counsel renewed his objection "on the grounds that it's not
a voluntary statement. The Defendant's bipolar and was incompetent to give consent." The
trial judge overruled the objection and admitted the statement. After the State rested, defense
counsel called appellant's mother, Elizabeth Stephenson, to the stand. Ms. Stephenson
testified that appellant was diagnosed as ADD in elementary school and was put on Ritalin. 
He was diagnosed as bipolar when he was 14. She explained appellant's mood swings and
stated that on Saturday, November 22, 2003-the day of the offense-he was in a manic state. 
She said that he was still manic when she saw him in jail the following Monday.

 The State called Dr. Friedman in rebuttal. He testified that appellant suffers from
depression, and that, if he is bipolar, Dr. Friedman has seen him only in the depressed state. 
The prosecutor asked Dr. Friedman about appellant's statement:

Q Dr. Friedman, have you reviewed the statement given to the police in this case?


A I saw the videotape of the statement that he gave, yes.


Q Do you think at the time that the Defendant gave that videotaped statement to the
police that he was able to voluntarily give a statement to the police?


A I believe so. I think he was depressed, but I think that the content of the videotape
makes it clear that he was aware of what he was doing and, you know, aware of whom
he was giving the statement to.

He acknowledged that on January 29, 2004, he found that appellant was not competent:

Q Why was that?


A At least I had a serious question about his competence. Because even though I saw
no sign that he was, you know, delusional, hallucinating or in any other way out of
touch with reality, he was acting so depressed at that time that I really couldn't get
him to communicate with me to any meaningful extent. And I was concerned that he
was so depressed that if he couldn't communicate with me, perhaps he was so
depressed he couldn't communicate with his attorney as well.

 And for that reason, I recommended that he be found incompetent and
committed to a state hospital for treatment.


Q And was that done?


A Yes.


Q And the - his demeanor on the video interview was different from the demeanor he
held with you on January the 29th?


A At the very beginning he was similarly, you know, kind of shut down and, you know,
acting withdrawn. But within a few minutes on the videotaped interview with the
police officer he began to talk very spontaneously, I thought.

 When I saw him in January of last year, I wasn't able to get him to talk, you
know, as spontaneously as he had talked to the police officer in the videotape a couple
of months before.

Dr. Friedman testified he then met with appellant on July 4th and July 30th and "felt at that
time that he had become competent as a result of his treatment at the state hospital."

 In closing argument, defense counsel again argued that appellant's confession was
false and suggested that he was willing to make it because "a person with bipolar disorder
might not have as good an appreciation for the consequences of what would happen to him
if he protected somebody, say, with a false confession."

 The State, in its closing, argued that the bipolar evidence was a rabbit trail: 

 And don't you also know that if his bipolar disorder in any way figured into
what he did here, that there'd be a doctor up here to tell us all about it. The
only doctor you heard from was called by the State and he told you that at the
time the Defendant committed this crime he knew it was wrong."

 

The jury found appellant guilty as charged and sentenced him to 75 years' imprisonment.

3. The Direct Appeal 

 Appellant argued on appeal that the trial court erred in failing to instruct the jury on
the law of voluntariness of custodial confessions. (8) The court of appeals, in a two-to-one
decision, disagreed. The majority noted the potentially conflicting precedents that we
mentioned in Perry v. State, (9) about whether the trial court must instruct the jury on the
voluntariness of a custodial confession. (10) The majority concluded that a challenge to the
voluntariness of a confession is a defensive issue; thus, under Posey v. State, (11) the defense
must request a jury instruction before any error can result. (12) Justice Jennings dissented,
stating that the majority had incorrectly found that there was no error in the jury charge and
that it failed to conduct an Almanza "egregious harm" analysis. (13) 

II. 


The Pertinent Law


 Under Article 38.21, "A statement of an accused may be used in evidence against him
if it appears that the same was freely and voluntarily made without compulsion or
persuasion[.]" (14) A defendant may claim that his statement was not freely and voluntarily
made and thus may not be used as evidence against him under several different theories: (1)
Article 38.22, § 6-general voluntariness; (2) Miranda v. Arizona (15) as expanded in Article
38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. (16) It may be
involuntary under one, two, or all three theories. A statement that is "involuntary" as a
matter of constitutional law is also "involuntary" under Article 38.22, but the converse need
not be true. The theory of involuntariness determines whether and what type of an
instruction may be appropriate. (17) Thus, the first step in deciding upon an appropriate jury
instruction is identifying the theory of involuntariness.

A. Claims of involuntariness under the Due Process Clause and Miranda

 A confession may be involuntary under the Due Process Clause only when there is
police overreaching. (18) Even if a confession is not the product of a meaningful choice (for
example, when it is made in response to hallucinations or to a private person's threat), it is
nonetheless "voluntary" within the meaning of the Due Process Clause absent some coercive
police activity. The Supreme Court made this clear in Colorado v. Connelly, (19) when it held
that if there is no police coercion or overreaching, there is no due-process violation-even if
a suspect is suffering from chronic schizophrenia and is in a psychotic state following the
"voice of God" at the time he confesses. (20) Absent police misconduct causally related to the
confession, there is "simply no basis for concluding that any state actor has deprived a
criminal defendant of due process of law." (21) The Due Process Clause is aimed at protecting
suspects from police overreaching, not at protecting people from themselves or other private
actors.

 The same is true for Miranda rights and waivers that apply to custodial-interrogation
statements. As the Supreme Court explained in Connelly: "Miranda protects defendants
against government coercion leading them to surrender rights protected by the Fifth
Amendment; it goes no further than that." (22) Thus, the defendant's waiver of his Miranda
rights, made under the perception of coercion flowing from the "voice of God, . . . is a matter
to which the United States Constitution does not speak." (23) As Judge Posner has explained:

 The significance of the principle of Connelly, the principle that the
Constitution doesn't protect the suspect against himself, is that if he
understands the Miranda warnings yet is moved by a crazy impulse to blurt out
a confession, the confession is admissible because it is not a product of
coercion. The police have given him his Miranda warnings in an intelligible
form; it is not their fault that he is impulsive. (24) 

 Statements that have been found to be involuntary under Miranda or the Due Process
Clause were collected in Connelly; (25) they involve the crucial element of police overreaching
and involve fact scenarios such as the following: (1) the suspect was subjected to a four-hour
interrogation while incapacitated and sedated in an intensive-care unit; (26) (2) the suspect,
while on medication, was interrogated for over eighteen hours without food, medication, or
sleep; (27) (3) the police officers held a gun to the head of the wounded suspect to extract a
confession; (28) (4) the police interrogated the suspect intermittently for sixteen days using
coercive tactics while he was held incommunicado in a closed cell without windows and was
given limited food; (29) (5) the suspect was held for four days with inadequate food and medical
attention until he confessed; (30) (6) the suspect was subjected to five days of repeated
questioning during which police employed coercive tactics; (31) (7) the suspect was held
incommunicado for three days with little food, and the confession was obtained when
officers informed him that their chief was preparing to admit a lynch mob into the jail; (32) (8)
the suspect was questioned by relays of officers for thirty-six hours without an opportunity
for sleep. (33) 

 As is evident from these fact scenarios, due-process and Miranda claims of
involuntariness generally do not require "sweeping inquiries into the state of mind of a
criminal defendant who has confessed." (34) They involve an objective assessment of police
behavior. The Constitution leaves voluntariness claims based on the defendant's state of
mind "to be resolved by state laws governing the admission of evidence." (35) In Texas, that
state law is Article 38.22, the Texas Confession Statute.

B. Claims of involuntariness under the Texas Confession Statute

 Article 38.22 of the Code of Criminal Procedure sets out rules governing the
admissibility of an accused's written and oral statements that are the product of custodial
interrogation. Under our precedents, however, Section 6 of Article 38.22 applies to both an
accused's custodial and non-custodial statements because it provides that only "voluntary"
statements may be admitted. (36) Sections 2 and 3 apply to an accused's custodial-interrogation
statements and provide that only "warned and waived" statements may be admitted. That is,
an accused's custodial-interrogation statement is not admissible unless, prior to making the
statement, he received the warnings provided in Article 15.17 or Article 38.22, § 2(a) or §
3(a) (which incorporate the requirements of Miranda), and he knowingly, intelligently, and
voluntarily waived those rights.

 Claims of involuntariness under Article 38.22 can be, but need not be, predicated on
police overreaching, and they could involve the "sweeping inquiries into the state of mind
of a criminal defendant who has confessed" found in Connelly that are not of themselves
relevant to due process claims. (37) Article 38.22 is aimed at protecting suspects from police
overreaching. But Section 6 of that article may also be construed as protecting people from
themselves because the focus is upon whether the defendant voluntarily made the statement. 
Period. Does it appear-as Article 38.21 requires-that the statement was freely and
voluntarily made without compulsion or persuasion? (38) Or, in the case of a custodial-interrogation statement, did the suspect "knowingly, intelligently, and voluntarily" waive the
rights set out in Article 38.22 § 2(a) or § (3)(a)? These inquiries do not turn solely on police
overreaching. The behavior of the police may or may not be a factor. A confession given
under the duress of hallucinations, illness, medications, (39) or even a private threat, for
example, could be involuntary under Article 38.21 and the Texas confession statute. (40) The
defendant in Connelly did not have a valid federal constitutional involuntariness claim, but,
had he confessed in Texas, he might have had a viable claim under Articles 38.21 and 38.22. 
As Professor Dix has noted, "evidence of a defendant's psychological abnormality" (such as
Connelly's evidence of hallucinations and following God's command) "has its full logical
relevance" under Texas law. (41)

 Under Articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise
a state-law claim of involuntariness (even though they do not raise a federal constitutional
claim) include the following: (1) the suspect was ill and on medication and that fact may
have rendered his confession involuntary; (42) (2) the suspect was mentally retarded and may
not have "knowingly, intelligently and voluntarily" waived his rights; (43) (3) the suspect
"lacked the mental capacity to understand his rights"; (44) (4) the suspect was intoxicated, and
he "did not know what he was signing and thought it was an accident report"; (45) (5) the
suspect was confronted by the brother-in-law of his murder victim and beaten; (46) (6) the
suspect was returned to the store he broke into "for questioning by several persons armed
'with six-shooters.'" (47) 

 In sum, the potential "involuntary" fact scenarios encompassed by Articles 38.21 and
38.22 are broader in scope than those covered by the Due Process Clause or Miranda. 
Although this Court has held that youth, intoxication, mental retardation, and other
disabilities are usually not enough, by themselves, to render a statement inadmissible under
Article 38.22, they are factors that a jury, armed with a proper instruction, is entitled to
consider. (48)

C. Jury Submission of Voluntariness Instructions

 Under Texas statutory law, there are three types of instructions that relate to the taking
of confessions: (1) a "general" Article 38.22, § 6 voluntariness instruction; (2) a "general"
Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3)
a "specific" Article 38.23(a) exclusionary-rule instruction. In essence, the Section 6
"general" instruction asks the jury: "Do you believe, beyond a reasonable doubt, that the
defendant's statement was voluntarily made? If it was not, do not consider the defendant's
confession." The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and asks
the jury to decide whether all of those requirements were met. The Article 38.23(a)
"specific" instruction is fact-based: For example, "Do you believe that Officer Obie held a
gun to the defendant's head to extract his statement? If so, do not consider the defendant's
confession."

 As we noted in Vasquez v. State, (49) confusion exists about which, if any, jury
instruction is appropriate because our case law "does not always distinguish, and sometimes
blurs, the requirements for getting an instruction under article 38.22 and for getting an
instruction under the exclusionary rule of article 38.23." (50)

 We again try to clarify the distinction: Due process and Miranda claims may warrant
both "general" and "specific" voluntariness instructions; Texas statutory claims warrant only
a "general" voluntariness instruction. It is the defendant's responsibility to delineate which
type of "involuntariness" he is claiming-a general (perhaps subjective) lack of voluntariness
or a specific police-coerced lack of voluntariness-because the jury instruction is very
different depending upon the type of claim. 

 Obviously, the evidence must raise a "voluntariness" issue, and the defendant should
request a jury instruction that relates to his theory of involuntariness. But if the defendant
never presents a proposed jury instruction (or fails to object to the lack of one), any potential
error in the charge is reviewed only for "egregious harm" under Almanza. (51)

1. Article 38.22, § 6 (General Voluntariness) Instructions

 Article 38.22, § 6 is a very detailed section that is essentially independent of the other
sections contained within Article 38.22. (52) Section 6 provides:

In all cases where a question is raised as to the voluntariness of a statement of
an accused, the court must make an independent finding in the absence of the
jury as to whether the statement was made under voluntary conditions. If the
statement has been found to have been voluntarily made and held admissible
as a matter of law and fact by the court in a hearing in the absence of the jury,
the court must enter an order stating its conclusion as to whether or not the
statement was voluntarily made, along with the specific finding of facts upon
which the conclusion was based, which order shall be filed among the papers
of the cause. Such order shall not be exhibited to the jury nor the finding
thereof made known to the jury in any manner. Upon the finding by the judge
as a matter of law and fact that the statement was voluntarily made, evidence
pertaining to such matter may be submitted to the jury and it shall be
instructed that unless the jury believes beyond a reasonable doubt that the
statement was voluntarily made, the jury shall not consider such statement for
any purpose nor any evidence obtained as a result thereof. In any case where
a motion to suppress the statement has been filed and evidence has been
submitted to the court on this issue, the court within its discretion may
reconsider such evidence in his finding that the statement was voluntarily
made and the same evidence submitted to the court at the hearing on the
motion to suppress shall be made a part of the record the same as if it were
being presented at the time of trial. However, the state or the defendant shall
be entitled to present any new evidence on the issue of the voluntariness of the
statement prior to the court's final ruling and order stating its findings. (53)


 The language "where a question is raised" contrasts with the language found in Article
38.22, § 7 and Article 38.23 which speaks of the evidence raising an issue. (54) Because raising
a "question" is what triggers the trial court's duty under Section 6 to conduct a hearing
outside the presence of the jury, the only reasonable reading of this language is that a
"question is raised" when the trial judge is notified by a party or raises on his own an issue
about the voluntariness of the confession. This is the sequence of events that seems to be
contemplated by Section 6: (1) a party notifies the trial judge that there is an issue about the
voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial
judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the
confession was voluntary; (55) (4) if the trial judge decides that the confession was voluntary,
it will be admitted, and a party may offer evidence before the jury suggesting that the
confession was not in fact voluntary; (5) if such evidence is offered before the jury, the trial
judge shall give the jury a voluntariness instruction. It is only after the trial judge is notified
of the voluntariness issue (or raises it on his own) that a chain of other requirements comes
into play, culminating in the defendant's right to a jury instruction.

 And Section 6 expressly dictates the content of that instruction to be as follows:
"unless the jury believes beyond a reasonable doubt that the statement was voluntarily made,
the jury shall not consider such statement for any purpose nor any evidence obtained as a
result thereof." Because Section 6 contains its own jury-instruction provision, it is not
governed by the jury-instruction provision found in Section 7. (56) The obvious purpose of
Section 7 is to authorize and require jury instructions regarding the warnings and safeguards
for written and oral statements outlined in Article 38.22, § 2 & § 3 (warnings on the right to
remain silent, right to counsel, etc).

 Consequently, a Section 6 instruction becomes "law applicable to the case" under
Posey v. State (57) only if the parties actually litigate a Section 6 voluntariness issue before the
trial judge. If such litigation occurs (on the admissibility of evidence for example), a jury
instruction need not be specifically requested to pass the Posey gateway, although a request
would still be necessary to obtain the most beneficial harm analysis under Almanza v. State. (58) 
 An interpretation of Section 6 that requires some sort of litigation before it becomes
law applicable to the case accords not only with the statutory language but also with common
sense. The broad range of voluntariness issues covered by Section 6 could easily be
implicated by evidence that would also be relevant for other purposes, and Section 6 does not
even require the existence of a factual dispute that might at least obliquely alert the trial
judge to the need for an instruction. The Section 6 requirement that voluntariness be litigated
in some manner before a jury instruction becomes necessary ensures that the trial judge is on
notice that the instruction is required. (59)

 For example, the evidence may be undisputed that the defendant did not sleep for 24
hours, or has a low I.Q., or was "high" on drugs at the time he gave his statement. If a
reasonable jury could find that the facts, disputed or undisputed, rendered him unable to
make a voluntary statement, he is entitled to a general voluntariness instruction when he has
raised a question of the voluntariness of his statement. 

2. Article 38.22, § 7 (Statutory Warnings) Instructions

 If the defendant made his statement as the result of custodial interrogation, he is also 
entitled-when the issue is raised by the evidence-to have the jury decide whether he was
adequately warned of his rights and knowingly and intelligently waived these rights. Section
7 of Article 38.22 states:

 When the issue is raised by the evidence, the trial judge shall appropriately
instruct the jury, generally, on the law pertaining to such statement. (60)

The phrase "the issue" refers to compliance with the statutory warnings set out in both
Articles 15.17 (Duties of Arresting Officer and Magistrate) and 38.22, §§ 2 & 3, and the
voluntariness of the defendant's waiver of the rights. For it to be "raised by the evidence"
there must be a genuine factual dispute, just as is true under Article 38.23 issues. The same
procedures-including a hearing outside the presence of the jury and the entry of written
findings-that apply to a general voluntariness challenge under Section 6, also apply to a
challenge that is made to the sufficiency of warnings and voluntary waiver of the rights
communicated by those warnings. As with Section 6, the trial judge's Section 7 jury
instructions are "general" ones that set out the pertinent law and legal requirements of
Sections 2 and 3 (or, in an appropriate case, those of Article 15.17). (61)

 But suppose there is some evidence that the police held a gun to the head of the
defendant-who, unbeknownst to the police, had not slept for twenty-four hours-to extract
the confession. In that case, the defendant may also be entitled to a fact-specific,
exclusionary-rule instruction, in addition to the two general voluntariness instructions.

3. Article 38.23 (Exclusionary Rule) Instructions

 Article 38.23 (a) states that

 (a) No evidence obtained by an officer or other person in violation of any
provisions of the Constitution or laws of the State of Texas, or of the
Constitution or laws of the United States of America, shall be admitted in
evidence against the accused on the trial of any criminal case.

 

 In any case where the legal evidence raises an issue hereunder, the jury shall
be instructed that if it believes, or has a reasonable doubt, that the evidence
was obtained in violation of the provisions of this Article, then and in such
event, the jury shall disregard any such evidence so obtained. (62)

 The wording is absolute ("the jury shall be instructed"), just as it is in Article 38.22,
but the triggering mechanism is more complex. (63) As we recently held in Madden v. State, (64)
the second sentence of Article 38.23 requires a jury instruction only if there is a genuine
dispute about a material fact. (65) A defendant must establish three foundation requirements to
trigger an Article 38.23 instruction: (1) the evidence heard by the jury must raise an issue
of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested
factual issue must be material to the lawfulness of the challenged conduct in obtaining the
statement claimed to be involuntary. (66) The defendant must offer evidence that, if credited,
would create a reasonable doubt as to a specific factual matter essential to the voluntariness
of the statement. (67) This factual dispute can be raised only by affirmative evidence, not by
mere cross-examination questions or argument. (68)

 For example, the officer in our hypothetical may deny, on cross-examination, that he
held a gun to the defendant's head to extract the confession. The implication by counsel, that
the officer did perform that act, does not, by itself, raise a disputed fact issue. But if the
defendant (or some other witness) testifies that the officer held a gun to his head, then a
disputed fact issue exists. And the jury must resolve that disputed fact issue. (69)

 If the jury finds that the officer did hold a gun to the defendant's head, the statement
is involuntary as a matter of federal constitutional law. If the jury finds the officer did not
do so, the statement is not constitutionally involuntary. Of course, if there is no disputed
factual issue-if there is a video definitively showing that the officer did or did not hold a gun
to the defendant's head-the legality of the conduct is determined by the trial judge alone, as
a question of law. The legal question would never go to the jury.

 Normally, "specific" exclusionary-rule instructions concerning the making of a
confession are warranted only where an officer uses inherently coercive practices like those
set out in Connelly. (70) In Texas, if there is a disputed fact issue about whether this type of
coercive practice was employed-by either an officer or a private citizen (71)-to wring a
confession out of a suspect against his will, a specific exclusionary-rule instruction under
Article 38.23 is appropriate.

4. Error in the Failure to Give Appropriate Voluntariness Instructions 

 The question then becomes: When does a trial judge err in failing to give an Article
38.22 or 38.23 jury instruction? As the court of appeals noted, our cases might appear to be
in conflict on whether there can be any error whatsoever-at least in the Article 38.23
context-absent a proper request by the defendant. The court of appeals pointed to Mendoza,
in which we stated, "Generally, when evidence from any source raises a defensive issue and
the defendant properly requests a jury charge on that issue, the trial court must submit the
issue to the jury." (72) But that general statement does not imply the converse-that the trial
court need never submit a jury instruction on a particular defensive issue unless the defendant
properly requests one. There is nothing in that sentence or in the rest of the Mendoza opinion
that states or holds that the trial judge shall instruct the jury to disregard illegally obtained
evidence only if the defendant requests a jury charge on that issue. (73) 

 The court of appeals's argument for concluding that a trial judge has no duty to
instruct the jury on the voluntariness of a defendant's statement under either Article 38.22
or Article 38.23 rests on the premise that the voluntariness of a confession is a "defensive
issue." And, under Posey v. State, (74) a trial court has no duty to instruct the jury on
unrequested defensive issues-such as mistake of fact. (75) A defensive issue is not "law
applicable to the case" for purposes of Article 36.14 (76) unless the defendant timely requests
the issue or objects to the omission of the issue in the jury charge. Any other holding, we
said in Posey, would render Article 36.14-which also requires a party to make specific
objections to the charge-meaningless, and "might encourage a defendant to retry the case on
appeal under a new defensive theory effectively giving him two bites at the apple." (77) We
stated that the result in Posey "in no way undercuts or limits Almanza's analytical framework
in cases to which Almanza applies" because when "Almanza speaks of 'errors' of
commission and omission in the court's charge, it speaks of issues upon which a trial court
has a duty to instruct without a request or objection from either party[.]" (78)

 The principle in Posey is that no rule or statute requires the trial judge to give
instructions on traditional defenses and defensive theories absent a defendant's request. As
we recently stated in Delgado: "The trial judge has an absolute sua sponte duty to prepare
a jury charge that accurately sets out the law applicable to the specific offense charged. But
it does not inevitably follow that he has a similar sua sponte duty to instruct the jury on all
potential defensive issues, lesser-included offenses, or evidentiary issues. These are issues
that frequently depend upon trial strategy and tactics." (79) These are also issues on which
instructions are not mandated by any statute. (80) Thus, under Posey, it is only when a
"requirement of [the] various statutory provisions referenced in Article 36.19 'has been
disregarded,'" that the trial court errs in omitting instructions relative to that statute. (81) 

 But where a rule or statute requires an instruction under the particular circumstances,
that instruction is "the law applicable to the case." Such statutes and rules set out an implicit
"If-then" proposition: If the evidence raises an issue of [voluntariness, accomplice witness,
confidential informant, etc.], then the trial court shall instruct the jury that [whatever the
statute or rule requires]. In Huizar v. State, (82) for example, we held that Article 37.07 is "the
law applicable" to all non-capital punishment proceedings. Thus, the trial judge must instruct
the jury at the punishment phase concerning that law, including the fact that the State must
prove any extraneous offenses beyond a reasonable doubt. (83) We distinguished Posey and
explained the difference between instructing the jury on "defensive" issues and instructing
them on the law that is applicable to all cases:

 In Posey, we held that "a defensive issue is not [law] 'applicable to the case'
for purposes of article 36.14 unless the defendant timely requests the issue or
objects to the omission of the issue in the jury charge." In contrast to a
"defense" which depends on the defendant's theory of the case and the
evidence presented, applicability of article 37.07 § 3(a) is not contingent on
either party's theory of the case. Rather, article 37.07 § 3(a) is a legislatively
prescribed burden of proof applicable to extraneous offense and bad act
evidence admitted at punishment in all non-capital cases. (84)

Similarly, Articles 38.21-38.23 are legislatively mandated procedures governing the
admission and consideration of a defendant's statements. Article 38.21 explicitly states that
voluntary statements may be used in evidence "under the rules hereafter prescribed" -that
is, Article 38.22 and Article 38.23.

 Article 38.22, § 6 is "the law applicable" to any case in which a "question" is raised
and litigated as to the "general" voluntariness of a statement of an accused. As noted above,
under that statute, the trial judge must then (1) make an independent determination that the
statement was made under voluntary conditions; and then (2) instruct the jurors that they
shall not consider the statement for any purpose unless they believe, beyond a reasonable
doubt, that the statement was made voluntarily. 

 Article 38.23 is "the law applicable" to any case in which a specific, disputed issue
of fact is raised concerning the constitutional voluntariness of the making of the defendant's
statement. These are statutorily mandated instructions and the trial judge must include them
in the jury instructions when the voluntariness of a defendant's statement is at issue. (85) 

III.
 

Application of the Law to This Case


 The question remains as to whether Article 38.22 or Article 38.23 jury instructions
were "the law applicable" to this particular case. The court of appeals noted that "there was 
evidence presented before the jury that appellant was in pain, was lied to about the evidence
against him, and displayed characteristics of being in a vulnerable mental state due to his
bipolar disorder." (86) That evidence was sufficient, according to the court of appeals, "to raise
the issue of voluntariness and to create a factual dispute as to voluntariness." (87) 

 We agree to a certain extent, but this evidence raised only a "general" voluntariness
question under Article 38.22, § 6, not a constitutional due-process claim that the statement
was illegally obtained under Article 38.23. Appellant's consistent claim, a claim which he
had litigated in the trial court, was that he was bipolar and in a depressed or manic state and
therefore he was unable to effectively waive his rights. There was evidence in the record that
appellant, two months after giving his confession, was declared incompetent to stand trial. 
The State's psychologist who found him incompetent to stand trial testified that he was
competent when he gave his confession, but, as appellant points out, that same psychologist
testified that appellant was manifesting symptoms of his bipolar disorder during his
interrogation, especially at the beginning. And appellant's mother testified that appellant was
in a "manic" state shortly before and after his arrest. The issue of voluntariness should have
been submitted to the jury under Article 38.22, § 6, because a reasonable jury could conclude,
based on this evidence, that the statement was not voluntary. This is a statutory claim and
focuses upon appellant's subjective mental state.

 Appellant did not raise any disputed factual issue under Article 38.23 concerning the
legality of obtaining his statement because there was no evidence of the type of police
coercion or overreaching envisioned by the Supreme Court in Connelly. Like Connelly,
appellant's confession may have been "involuntary" because of his own subjective mental
status, but not because of illegal police conduct. Although appellant notes that Investigator
Guidry lied to him about some witnesses having identified him in the photo spread, it is well
established that lying about the state of the evidence is not the sort of "overreaching" that
implicates the Due Process Clause, as long as the subterfuge used is not one likely to produce
an untrue statement. (88) Furthermore, there was no factual dispute concerning Investigator
Guidry's conduct. She lied about the result of the photo line-up. That is undisputed. The
trial judge would resolve any purported due process claim as a matter of law because there
was no factual dispute. Therefore, a jury instruction under Article 38.23 is not "the law
applicable" to this case. 

 Article 38.22, § 6 was "the law applicable" to this case; Article 38.23 was not. But
because appellant never requested an Article 38.22, § 6 "general" voluntariness instruction,
he is entitled to review of that error only under Almanza's "egregious harm" standard. (89) 
Under that standard, reversible error in the omission of a required jury instruction without
objection occurs only when a defendant has been denied "a fair and impartial trial." (90) We
therefore reverse the court of appeals and remand this case for further proceedings consistent
with this opinion. 

Delivered: June 4, 2008

Publish
1. We granted review of Appellant's sole question: "Did the court of appeals err by
disregarding Thomas in preference of Mendoza, when deciding whether 'egregious harm'
resulted by the trial court's failure to sua sponte instruct the jury pursuant to 38.22 and 38.23,
where a factual dispute existed regarding the voluntariness of appellant's statement?"
2. Tex. Code Crim. Proc. art. 38.22, §§ 6-7. 
3. Almanza v. State, 686 S.W.2d 157 (Tex. Crim. App. 1985).
4. Oursbourn v. State, ___ S.W.3d ___, No. 01-05-00141-CR, 2006 Tex. App. LEXIS
8407, at *18 (Tex. App.-Houston [1st Dist.] Sept. 28, 2006).
5. Dr. Friedman explained:

 As the videotape continued and the interview progressed, he became increasingly
more verbal with her. He appeared to not only understand what the allegations
were, what the charges were against him, but he also appeared motivated to
present his behavior in a way that suggested an alternative explanation for what he
was charged with, which to me meant that he was at that time motivated to
basically portray himself and his actions in a better light than those in which the
offense report had portrayed them.
6. The trial judge asked whether a person with bipolar disorder could be both competent
and incompetent in a single 20-minute period. Dr. Friedman said no, because the mood swings
just don't occur "that rapidly." When asked whether a bipolar individual in a depressed or manic
state would be incompetent, Dr. Friedman said: "It might, but it doesn't necessarily mean that."
7. The court of appeals abated this appeal to the trial court to make the findings of fact and
conclusions of law required by art. 38.22, § 6. Oursbourn, __ S.W.3d at __, 2006 Tex. App.
LEXIS 8407, at *4.
8. Appellant claimed that the trial judge had a "sua sponte" duty to include such an
instruction. The term "sua sponte" in this context means simply that the applicable law requires
the trial judge to include such an instruction under the appropriate circumstances. The term "sua
sponte" does not increase or modify the trial judge's responsibility to instruct the jury on the
applicable law.
9. 158 S.W.3d 438, 443 & n.1 (Tex. Crim. App. 2004).
10. The court of appeals suggested that one line of cases, represented by Mendoza v. State,
88 S.W.3d 236, 239 (Tex. Crim. App. 2002), requires the defendant to request an instruction on
voluntariness before any error can be found. The second line of cases, represented by Thomas v.
State, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986), focuses on the appellate standard of review
for harm if the defendant does not request such an instruction. 

 In Mendoza, the question before us was whether the trial court properly included
defendant's requested general instructions on voluntariness (based on art. 38.22), while
excluding his others (based on art. 38.23). 88 S.W.3d at 239. In Thomas, the question was
whether the trial court erred in failing to include a properly worded Article 38.23 instruction. 
Thomas had requested an improperly worded instruction. We found no error and opted not to
decide "whether appellant preserved any asserted jury charge error." 723 S.W.2d at 707.
11. 966 S.W.2d 57, 60-61 (Tex. Crim. App. 1998).
12. Oursbourn, ___ S.W.3d at ___, 2006 Tex. App. LEXIS 8407, at *17-19.
13. Id. at ___, 2006 Tex. App. LEXIS 8407, at *19-30 (Jennings, J., dissenting).
14. Tex. Code Crim. Proc. art. 38.21. 
15. 384 U.S. 436 (1966)
16. Wolfe v. State, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996).
17. See 41 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice
and Procedure § 13.391 at 218 (2d ed. 2001) ("Jury submission of matters under article
38.23(a) may be different from submission under article 38.22. Therefore, in some cases care
must be taken to identify the basis for the defendant's claim that the jury should be instructed as
to a need to disregard a self-incriminating statement.").
18. See Perry, 158 S.W.3d at 446 (defendant not entitled to any jury instruction under art.
38.23(a) as evidence of his intoxication and injury "does not raise any constitutional
voluntariness issues because this evidence does not involve any police coercion or other official
over-reaching."); Alvarado v. State, 912 S.W.2dd 199, 211 (Tex. Crim. App. 1999) (statement
involuntary under federal due process "only if there was official, coercive conduct of such a
nature that any statement obtained thereby was unlikely to have been the product of an essentially
free and unconstrained choice by its maker").
19. 479 U.S. 157 (U.S. 1986).
20. Id. at 164. In Connelly, the defendant approached a Denver police officer and said that
"he had come all the way from Boston to confess to the murder of Mary Ann Junta, a young girl
whom he had killed in Denver sometime during November 1982." Id. at 160. Unbeknownst to
the police (who scrupulously followed the dictates of Miranda), the defendant was apparently
obeying the "voice of God" which had instructed him "to withdraw money from the bank, to buy
an airplane ticket, and to fly from Boston to Denver." Id. at 161. Even though the evidence
showed that the defendant was suffering from "command hallucinations that interfered with his
volitional abilities; that is, his ability to make free and rational choices" and "he wasn't capable
of making a 'free decision' to waive his Miranda rights," his confession was not involuntary
under the Fifth Amendment. Id. at 161-64, 169-71.
21. Id. at 164.
22. Id. at 170.
23. Id. at 170-71.
24. Rice v. Cooper, 148 F.3d 747, 750 (7th Cir. 1998).
25. 479 U.S. at 164 n.1.
26. Mincey v. Arizona, 437 U.S. 385 (1978).
27. Greenwald v. Wisconsin, 390 U.S. 519 (1968).
28. Beecher v. Alabama, 389 U.S. 35 (1967).
29. Davis v. North Carolina, 384 U.S. 737 (1966).
30. Reck v. Pate, 367 U.S. 433 (1961).
31. Culombe v. Connecticut, 367 U.S. 568 (1961).
32. Payne v. Arkansas, 356 U.S. 560 (1958).
33. Ashcraft v. Tennessee, 322 U.S. 143 (1944). 
34. Connelly, 479 U.S. at 167.
35. Id.
36. State v. Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) ("Article 38.22, Section
6, literally applies to 'all cases where a question is raised as to the voluntariness of a statement of
an accused.'"). In Terrazas, this court explicitly overruled Nenno v. State, 970 S.W.2d 549, 556
(Tex. Crim. App. 1998), to the extent that it held that Article 38.22, § 6 applied only to custodial
statements. Id. However, the Court concluded in Terrazas that the trial court erred, as a matter
of law, in ruling that the defendant's statement to a Department of Human Services investigator
could be considered "involuntary." Id. at 726 (the investigator "telling [defendant] in a
noncustodial setting 'what had to be' in her statement is not the type of practice that has been
held to be inherently coercive as to make a statement involuntary").
37. Connelly, 479 U.S. at 166-67.
38. Tex. Code Crim. Proc. art. 38.21 ("A statement of an accused may be used in
evidence against him if it appears that the same was freely and voluntarily made without
compulsion or persuasion, under the rules hereafter prescribed.").
39. See, e.g., Rocha v. State, 16 S.W.3d 1, 19-20 (Tex. Crim. App. 2000) (trial court's
general jury instruction under articles 38.21 and 38.22 concerning voluntariness of statement
sufficed for jury to consider any evidence of his illness and medication; no error in denying
instruction that specifically mentioned illness and medication as that would be a comment on the
weight of the evidence). 
40. This has long been the case in Texas. See Cain v. State, 18 Tex. 387, 389-90 (1857)
("Before confessions can be received in evidence in a criminal case, it must be shown that they
were voluntary. They must not have been obtained by the influence of hope or fear, applied by a
third person to the prisoner's mind.").
41. George E. Dix, "Voluntariness" and "Intelligence" of Confessions as "Independent"
Texas Law Issues, 20 Tex. Tech L. Rev. 1017, 1080, 1091 (1989). 
42. Rocha v. State, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000).
43. Bell v. State, 582 S.W.2d 800, 812 (Tex. Crim. App. 1979); Casias v. State, 452
S.W.2d 483, 488 (Tex. Crim. App. 1970).
44. Rogers v. State, 549 S.W.2d 726, 729-30 (Tex. Crim. App. 1977) (finding reversible
error in trial court's refusal to give jury general instruction on voluntariness of statement when
evidence raised an issue that defendant lacked the mental capacity to understand and waive his
rights before giving his statement).
45. Ritchie v. State, 296 S.W.2d 551, 554 (Tex. Crim. App. 1956). In Ritchie, the
evidence was undisputed that the defendant was intoxicated, but the trial judge found that he was
not so intoxicated that he could not understand what he was doing. Id. Therefore, the trial judge
"instructed the jury not to consider the [statement] unless they believed beyond a reasonable
doubt that, prior to making the statement, the appellant was duly warned, and that thereafter he
voluntarily and freely made the same and understood and signed it." This Court held that the
trial court did not err in admitting the evidence and instructing the jury as he did. Id.; see also
Foster v. State, 101 S.W.3d 490, 497 (Tex. App.- Houston [1st Dist.] 2002, no pet.) (noting that
"[l]ack of sleep for as long as 16 hours does not, in and of itself, render a confession
involuntary," and that "a person's illiteracy alone will not necessarily render his statement
inadmissible.").
46. Hamin v. State, 47 S.W. 656 (Tex. Crim. App.1898). As Professor Dix points out, in
these early decisions, "It was simply beyond question that private coercion rendered a confession
involuntary and that even private detention invoked the predecessor to article 38.22." Dix, 20
Tex. Tech L. Rev. at 1083. After 1977, however, the provisions of Article 38.22 (except for
Sections 6 and 7) apply only to custodial interrogations by law enforcement officials. See 41 Dix
& Dawson, supra note 17, § 13.31 at 33-35.
47. Warren v. State, 29 Tex. 369 (1867); See also Dix, 20 Tex. Tech L. Rev. at 1084. 
48. See Rogers, 549 S.W.2d at 729-30; Ritchie, 296 S.W.2d at 554; see also Grayson v.
State, 438 S.W.2d 553, 555 (Tex. Crim. App. 1969) (upholding trial court's ruling that statement
was admissible despite defendant's mental retardation and stating that jury was given proper
instruction to redetermine voluntariness; "Whether appellant had the mental competency or
intelligence required to waive his right to remain silent and to have counsel present was for the
court and the jury. The issue was fairly presented and resolved against appellant.").
49. 225 S.W.3d 541 (Tex. Crim. App. 2007).
50. Id. at 544.
51. See Madden v. State, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007).
52. See State v. Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (deciding that
Article 38.22, § 5's provision exempting non-custodial statements from the coverage of Article
38.22 did not apply to § 6). 
53. Tex. Code Crim. Proc. art. 38.22, § 6 (emphasis added).
54. See Tex. Code Crim. Proc. arts. 38.22, § 7 ("When the issue is raised by the evidence
. . . ") and 38.23(a) ("where the legal evidence raises an issue hereunder . . .").
55. The trial judge must also make written findings of fact and conclusions of law in
support of his ruling. Tex. Code Crim. Proc. art. 38.22, § 6. The need for written findings
should alert the parties and trial judge to the need for a general voluntariness jury instruction as
well.
56. See Terrazas, supra (§ 5 not applicable to § 6, given the specific provisions found in §
6). 
57. 966 S.W.2d 57, 60 (Tex. Crim. App. 1998) (a defensive issue is not "law applicable to
the case" unless the defendant timely requests the issue or objects to its omission from the jury
charge).
58. 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) ("some harm" versus "egregious harm").
59. Vasquez v. State, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) (noting that, although a
defendant may be entitled to an Article 38.22 jury instruction even when the evidence is
undisputed, "[s]ome evidence must have been presented to the jury that the defendant's
confession was not given voluntarily.").
60. Tex. Code Crim. Proc. art. 38.22, § 7.
61. See, e.g., Mendoza v. State, 88 S.W.3d at 238 n.1 (Tex. Crim. App. 2002) (quoting a
portion of an Article 38.22, § 7 jury instruction).
62. Tex. Code Crim. Proc. art. 38.23.
63. See Murphy v. State, 640 S.W.2d 297, 299 (Tex. Crim. App. 1982).
64. 242 S.W.3d 504 (Tex. Crim. App. 2007). 
65. Id. at 510; See also Holmes v. State, 248 S.W.3d 194, 199 (Tex. Crim. App. 2008);
Pierce v. State, 32 S.W.3d 247, 251 (Tex. Crim. App. 2000).
66. 242 S.W.3d 510.
67. Id. See also 40 George E. Dix & Robert O. Dawson, Texas Practice: Criminal
Practice and Procedure, § 4.194, at 282 (2d. ed. 2001).
68. Madden, 242 S.W.3d at 513 nn. 22-23.
69. A fact-specific, exclusionary-rule instruction might look something like this:

 If you find from the evidence that Officer Obie held a gun to the defendant's head
in an effort to make the defendant give him a statement, or if you have a
reasonable doubt thereof, you will disregard the defendant's videotaped statement
and not use it for any purpose whatsoever during your deliberations. However, if
you find from the evidence, beyond a reasonable doubt, that Officer Obie did not
hold a gun to the defendant's head in an effort to make the defendant give him a
statement, then you may consider the defendant's videotaped statement during
your deliberations.
70. Connelly, 479 U.S. at 164 & n.1; see also State v. Terrazas, 4 S.W.3d 720, 727 (Tex.
Crim. App. 1999) (citing Note: Evidence-Criminal Law-Constitutional Law-Due
Process-Confessions-Judge and Jury-Determination of Preliminary Fact of Voluntariness of
Confession, 3 Baylor L.Rev. 561, 563-65 (1951) (inherently coercive practices include:
subjection to persistent and protracted questioning, threats of mob violence, unlawful detention
incommunicado without advice of counsel or friends, and taking at night to lonely and isolated
places for questioning)).
71. See Miles v. State, 241 S.W.3d 28, 39 (Tex. Crim. App. 2007).
72. Mendoza v. State, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002).
73. Indeed, the opinion indicates that the trial judge shall instruct the jury whenever a fact
issue is raised concerning the legality of obtaining evidence. A little later in Mendoza, we stated:

 Further, art. 38.23(a) provides that in any case where a party raises an issue
regarding whether evidence was obtained in violation of the laws of Texas or the
United States, the jury shall be instructed that if it believes, or has a reasonable
doubt, that the evidence was obtained because of such a violation, then the jury
shall disregard any such evidence. 

Id. at 239. Then we stated:

 When the evidence presented at trial raises a factual issue as to whether a
defendant had been warned of his rights and voluntarily waived them prior to
making a statement, he is entitled to an instruction on voluntariness of the
confession. In such cases, it is proper to include in the jury charge a specific
instruction informing the jury that, if it has a reasonable doubt as to whether a
defendant knowingly, intelligently, and voluntarily waived his rights before giving
a confession, it must disregard the confession and not consider it for any purpose.

Id. (citation omitted). We later stated:

 In any case in which the evidence raises an issue regarding whether evidence was
obtained in violation of the laws of Texas, the jury shall be instructed that if it
believes, or has a reasonable doubt, that the evidence was obtained in violation
thereof, then the jury shall disregard any such evidence. The terms of art. 38.23(a)
are mandatory. Therefore, when an issue of fact is raised as to compulsion or
persuasion in obtaining a confession, a defendant has a statutory right to have the
jury charged accordingly.

Id. (citation omitted). Nowhere did we say that this statutory entitlement depends upon the
defendant making a proper request for a jury instruction on "general" voluntariness or a
"specific" instruction on illegally obtained evidence.
74. 966 S.W.2d 57 (Tex. Crim. App. 1998).
75. Id. at 60.
76. Tex. Code Crim. Proc. art. 36.14 (stating, in pertinent part, that "in each felony case
and in each misdemeanor case tried in a court of record, the judge shall, before the argument
begins, deliver to the jury, except in pleas of guilty, where a jury has been waived, a written
charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the
weight of the evidence, not summing up the testimony, discussing the facts or using any
argument in his charge calculated to arouse the sympathy or excite the passions of the jury.").
77. 966 S.W.2d at 62-63.
78. Id. at 61 n.9.
79. Delgado v. State, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (footnote omitted). 
80. For example, Tex. R. Evid. 105(a) explicitly recognizes that the advocates bear full
responsibility for requesting appropriate limiting instructions when they are entitled to them. The
rule states:

 (a) Limiting Instruction. --When evidence which is admissible as to one party or
for one purpose but not admissible as to another party or for another purpose is
admitted, the court, upon request, shall restrict the evidence to its proper scope
and instruct the jury accordingly; but, in the absence of such request the court's
action in admitting such evidence without limitation shall not be a ground for
complaint on appeal.

Tex. R. Evid. 105(a) (emphasis added). Trial judges should be wary of giving a limiting
instruction under Rule 105(a) without a request because a party might well intentionally forego a
limiting instruction as part of its deliberate strategy "to minimize the jury's recollection of the
unfavorable evidence." United States v. Johnson, 46 F.3d 1166, 1171 (D.C. Cir. 1995).
81. Posey, 966 S.W.2d at 60 & n.5.
82. 12 S.W.3d 479 (Tex. Crim. App. 2000).
83. Id. at 484.
84. Id. at 484 n.7 (citations omitted). As was noted by the Austin Court of Appeals, the
same is true for instructions on accomplice-witness testimony:

 An instruction as to the proper effect of accomplice-witness testimony . . . is not a
defensive issue. Unlike defensive issues which are discretionary, the need for
corroborating evidence when basing a conviction on an accomplice's testimony is
codified by our legislature. Tex. Code Crim. Proc. Ann. art. 38.14. Although deciding
which defensive issues to request is typically a strategic decision left to the lawyer and
client, it is difficult to think of a situation where any reasonably competent lawyer would
not seek an accomplice-witness instruction for strategic reasons. We find that the
statutorily required instruction regarding accomplice-witness testimony, unlike defensive
issues, is "law applicable to the case." A failure to instruct the jury that an accomplice's
testimony must be corroborated by other evidence tending to connect the defendant to the
crime is error.

Howard v. State, 972 S.W.2d 121, 126 (Tex. App.-Austin 1998, no pet.).

85. We recently reiterated this duty in Pickens v. State, 165 S.W.3d 675 (Tex. Crim. App.
2005):

 Based upon our holding in Almanza, supra, that unobjected-to jury-charge error
warrants reversal only when the error results in egregious harm, we have held that
the question of whether the defendant has preserved jury-charge error is relevant
only if there is a determination that error actually occurred. Thomas v. State, 723
S.W.2d 696, 707 (Tex. Crim. App. 1986). Thomas also acknowledged that Article
38.23 provides in mandatory terms "that a jury is to be instructed to resolve
factual disputes over whether evidence was illegally obtained and, therefore,
inadmissible." Id. We have more recently reiterated that "an Article 38.23
instruction must be included in the jury charge only if there is a factual dispute
about how the evidence was obtained." Garza v. State, 126 S.W.3d 79, 85 (Tex.
Crim. App. 2004). Thus, if a defendant raises a factual dispute about whether
evidence was illegally obtained, an Article 38.23 instruction must be included in
the jury charge.

Id. at 680.
86. Oursbourn, ___ S.W.3d at ___, 2006 Tex. App. LEXIS 8407, at *13.
87. Id.
88. See Frazier v. Cupp, 394 U.S. 731, 737-39 (1969) (refusing to find that a defendant
who confesses, after being falsely told that his codefendant has turned State's evidence, does so
involuntarily); Rodriquez v. State, 934 S.W.2d 881, 890-91 (Tex. App.-Waco 1996, no pet.)
("The fact that the interrogating officers falsely stated to Rodriquez that the victim, on his
deathbed, identified him as the assailant does not support a finding that the confession was
involuntarily given. The voluntariness of a confession is not destroyed, and a confession induced
by deception or trickery, is not inadmissible, unless the method used was calculated to produce
an untruthful confession or was offensive to due process."); Snow v. State, 721 S.W.2d 943, 946
(Tex. App.- Houston [1st Dist.] 1986, no pet. ) ("voluntariness is not destroyed, and a confession
induced by deception or trickery is not inadmissible, unless the method used was calculated to
produce an untruthful confession or was offensive to due process."); see also Holland v.
McGinnis, 963 F.2d 1044, 1051-52 (7th Cir. 1992) (police officer's misrepresentations
concerning the strength of the evidence against the suspect "interfered little, if at all, with his
'free and deliberate choice' of whether to confess, for it did not lead him to consider anything
beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and
wrong, and his judgment regarding the likelihood that the police had garnered enough valid
evidence linking him to the crime. In other words, the deception did not interject the type of
extrinsic considerations that would overcome Holland's will by distorting an otherwise rational
choice of whether to confess or remain silent.") (citation omitted); see generally, C.T. Drechsler,
Annotation, Admissibility of Confession as Affected by Its Inducement through Artifice,
Deception, Trickery, or Fraud, 99 A.L.R.2d 772 (1965 & Supp. 1993).
89. Under Almanza, the issue to address is the impact of the omission of a "general"
voluntariness instruction. See Ellison v. State, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002); see
also Posey, 966 S.W.2d at 60 n.3
90. Almanza, 686 S.W.2d at 171.